# EXHIBIT 1

```
 1              UNITED STATES DISTRICT COURT
 2     EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION
 3
 4   JASON ANDERSON,              )
                                  )
 5           Plaintiff,           )
                                  )
 6                                )
             vs.                  ) Case No. 2:17-cv-00137-JAM-DB
 7                                )
                                  )
 8   CITY OF VALLEJO, a           )
     municipal corporation;       )
 9   et al.                       )
                                  )
10           Defendants.          )
                                  )
11   _____    )
12
13
14
15
16        VIDEOTAPED DEPOSITION OF JASON ANDERSON
17                  December 18, 2018
18                     1:56 p.m.
19                Vallejo, California
20
21
22
23
24   REPORTED BY:   CECILIA E. RODRIGUEZ
                    CSR No. 11479, RPR
25
```

## Page 2

```
 1  APPEARANCES:
 2     For Plaintiff:
 3        LAW OFFICES OF JOHN L. BURRIS
          K. CHIKE ODIWE, ESQUIRE
 4        Airport Corporate Centre
          7677 Oakport Street
 5        Suite 1120
          Oakland, California 94621
 6        (510) 839-5200
          chike.odiwe@johnburrislaw.com
 7
       For Defendants:
 8
          CITY OF VALLEJO
 9        TIMOTHY R. SMYTH, DEPUTY CITY ATTORNEY
          555 Santa Clara Street
10        Third Floor
          Post Office Box 3068
11        Vallejo, California 94590
          (707) 648-4545
12        timothy.smyth@cityofvallejo.net
13     Also Present:
14        STUART PETTIGREW, Stuart Pettigrew Video
          Services
15        4521 Adeline Street
          Emeryville, California 94608
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1           INDEX TO EXAMINATION
 2
 3     WITNESS: JASON ANDERSON
 4  EXAMINATION                         PAGE
 5  By Mr. Smyth                          6
```

## Page 4

```
 1           INDEX TO EXHIBITS
 2              JASON ANDERSON
 3       Anderson vs. The City of Vallejo
 4         Tuesday, December 18, 2018
 5
 6  MARKED      DESCRIPTION               PAGE
 7  Exhibit 1   Photograph                 38
 8  Exhibit 2   Photograph                 38
 9  Exhibit 3   Kaiser Medical Records     86
10  Exhibit 4   Vallejo Police Department 104
11              Notice to Appear
```

## Page 5

```
 1              Vallejo, California
 2       Tuesday, December 18, 2018, 1:56 p.m.
 3                  PROCEEDINGS
 4       THE VIDEOGRAPHER:  We're going on the
 5  record at approximately 1:56 p.m.  This is the
 6  videotaped deposition of Jason Anderson taken on
 7  behalf of the defendants and is being produced for
 8  Timothy R. Smyth, Deputy City Attorney.
 9       It's in the matter of Jason Anderson vs.
10  The City of Vallejo and others.  The case is in the
11  United States District Court, Eastern District of
12  California, Sacramento Division.  The case number
13  of which is 2:17-cv-00137-JAM-DB.
14       This deposition is being held at the City
15  Attorney's office, City of Vallejo in Vallejo,
16  California, on December 18, 2018.
17       The video operator is Stuart Pettigrew of
18  Stuart Pettigrew Video located in Emeryville,
19  California, (510) 469-7440.  The court reporter is
20  Cecilia Rodriguez of Doucette & Associates located
21  in Vallejo, California.
22       Will counsel please state their
23  appearances for the record.
24       MR. SMYTH:  I'm Timothy Smyth for the City
25  of Vallejo and the defendants.
```

Page 14

1  Q   And then when did you go to Contra Costa
2  College?
3  A   Next year.
4  Q   Did you receive any degrees?
5  A   No.
6  Q   Have you done any -- well, strike that.
7      Did you have a particular major or focus
8  when you were going to those -- either of those
9  colleges?
10 A   No. Sports.
11 Q   So you're -- when you say "sports," is
12 that a major or were you actually --
13 A   No.
14 Q   -- playing sports?
15 A   That's just where I played basketball.
16 Q   Did you -- have you at any point taken
17 any -- done any other vocational training or trade
18 school or anything?
19 A   Yes.
20 Q   Okay. And what is that?
21 A   I went to WyoTech in Fremont.
22     THE COURT REPORTER: What is it?
23     THE WITNESS: WyoTech, Sequoia Institute
24 WyoTech.
25 ///

Page 15

1  BY MR. SMYTH:
2  Q   Can you spell that?
3  A   W-y-o Tech.
4  Q   And what was your focus at that school?
5  A   Auto technology.
6  Q   Auto, like in vehicles?
7  A   Mechanic, yeah.
8  Q   Did you receive any sort of certifications
9  or licenses?
10 A   Yes. Just in auto technology, certified
11 mechanic.
12 Q   Okay. And when did you go to WyoTech,
13 what years?
14 A   I did 2004, I think.
15 Q   And did you -- how long were you there
16 for?
17 A   Two years.
18 Q   Two years. So like 2004 to 2006?
19 A   Yes.
20 Q   And let's go into your work history a
21 little bit.
22     What is your -- who is current employer?
23 A   City of Berkeley.
24 Q   And what is your job with City of
25 Berkeley?

Page 16

1  A   Refuse worker -- garbage man.
2  Q   And how long have you had that job?
3  A   Since 2016.
4  Q   2016? And what did you do before that?
5  A   Auto transportation.
6  Q   And did you work for a company?
7  A   Myself.
8  Q   And what was the name of the company or
9  the business that you had?
10 A   Anderson Auto Transport.
11 Q   And was it just you who worked as an
12 employee of Anderson Auto Transport?
13 A   Yeah. I mean, I had help from time to
14 time, but mainly just me.
15 Q   Okay. When you say you "had help," it was
16 just -- were they actually employees of Anderson
17 Auto Transport?
18 A   No, just help.
19 Q   Okay. And is that company -- was a it
20 sole proprietorship?
21 A   Yes.
22 Q   Okay. And how long did you run Anderson
23 Auto Transport?
24 A   2008 to 2015.
25 Q   And what did you do before Anderson Auto

Page 17

1  Transport?
2  A   I wasn't employed.
3  Q   You were in school still?
4  A   Yeah. No job. Yeah. I was in school
5  still, no job.
6  Q   So Anderson Auto Transport was really your
7  first -- your first job outside of school?
8  A   Yes.
9  Q   And when you started Anderson Auto
10 Transport, did you register the trade name with any
11 entities?
12 A   Get in -- I don't understand the question.
13 Q   Well, when you start a business, sometimes
14 you fill paperwork out.
15 A   With the city?
16 Q   Maybe a city or other entities. You know,
17 you can get -- there are all sorts of things you
18 can do when you start a business.
19 A   Yeah. I had licenses and permits,
20 everything with the -- my City of Hercules.
21 Q   So you obtained licenses and permits --
22 A   Yes.
23 Q   -- from the City of Hercules?
24 A   Yes.
25 Q   And that was in 2008 when you first

Page 18

1 started working as Anderson Auto Transport?
2  A  Yes.
3  Q  Were there any other -- other than the
4 City of Hercules, did you register the company in
5 any other entities?
6     MR. ODIWE: Objection. Lacks foundation.
7 Calls for speculation.
8     THE WITNESS: Just DOT, California
9 license -- Department of Transportation.
10 BY MR. SMYTH:
11  Q  So the Department of Transportation?
12  A  Yeah, CA number.
13  Q  Okay. Do you still have any of the
14 documentation, either the license permits or any
15 other certification from any of what you registered
16 your business for, any paperwork?
17  A  No. I don't think so.
18  Q  Did you get rid of it at any point?
19  A  It's not valid, so I don't have it. I
20 probably have record of it, but it's all expired
21 now.
22  Q  Okay. Well, if you have any record of the
23 entity, I just ask that you provide it to your
24 counsel, and counsel can provide it to us.
25     And, actually, that kind of takes me back

Page 19

1 a little bit.
2     What did you do to prepare for your
3 deposition today?
4  A  I just came here.
5  Q  Did you speak to your attorney?
6  A  Oh, I've spoken to my counsel before.
7  Q  Okay. Now, I don't want to know the
8 substance of that because that is subject to
9 attorney-client privilege.
10     But at any point prior to the deposition
11 in order to prepare for your deposition, did you
12 look at any documents?
13  A  No. Documents of what, like case or
14 whatever?
15  Q  Yeah, anything.
16  A  No.
17  Q  Any photographs?
18  A  No.
19  Q  Did you review any videos or audio
20 footage?
21  A  No.
22  Q  Any medical records?
23  A  No.
24  Q  Did you speak to anyone other than your
25 attorney?

Page 20

1  A  No.
2  Q  You didn't speak to either of your parents
3 about today's deposition?
4  A  No.
5  Q  So, as I had mentioned earlier, we're here
6 to talk about the incident that occurred on
7 January 9, 2015.
8     You understand that, correct?
9  A  Mm-hmm. Yes.
10  Q  And do you recall the approximate time
11 that the -- that you were -- first came into
12 contact with any Vallejo police officers --
13     MR. ODIWE: Objection. Vague.
14 BY MR. SMYTH:
15  Q  -- on that day?
16  A  No, not approximately.
17  Q  Was it middle of the day or morning or
18 evening, if you can give me that?
19  A  Afternoon.
20  Q  It was afternoon?
21  A  Yeah.
22  Q  So before the incident, you presumably
23 woke up at some point that day, correct?
24  A  Yes.
25  Q  Do you recall what time you got up that

Page 21

1 day?
2  A  No, I don't recall.
3  Q  Did you go anywhere that day before you
4 began moving cars in the city of Vallejo?
5     MR. ODIWE: Objection. Vague.
6     THE WITNESS: No. Just went to work.
7 BY MR. SMYTH:
8  Q  Okay. Well, it's -- where did you go to
9 work? Did you have an actual office of business?
10  A  I go to the auction.
11  Q  The auction?
12  A  Yeah, Tracy.
13  Q  So on the day prior to coming into contact
14 with any officers, you went to the Tracy auction,
15 correct?
16  A  Yes.
17  Q  And was that -- can you estimate about
18 what time you arrived at the Tracy auction that
19 day?
20  A  At about almost 11.
21  Q  11?
22  A  11 a.m.
23  Q  And is the Tracy auction in Tracy,
24 California?
25  A  Yeah.

Page 22

1  Q  And prior to going to the Tracy auction,
2  did you go anywhere else that day?
3  A  Hayward auction.
4  Q  So on that morning you went to the Hayward
5  auction?
6  A  Yes.
7  Q  What time were you at the Hayward auction?
8  A  Probably right before noon.
9  Q  And so the Hayward auction came after
10 Tracy?
11 A  Yes.
12 Q  Did you go anywhere before the Tracy
13 auction?
14 A  No. Maybe just get gas. Nowhere else,
15 though.
16 Q  Okay. And so that day -- so you arrived
17 at 11 o'clock at the Tracy auction; is that
18 correct?
19 A  Yes.
20 Q  And what did you do at the Tracy auction?
21 A  Picked up a car.
22 Q  And did you have as a job to go pick up
23 that car? Was that something that you had as a
24 job?
25 A  Yes.

Page 23

1  Q  And who was that job for?
2  A  Multiple dealers. But that day I was
3  picking up a car for AutoLinx in Vallejo.
4  Q  And so how did you first get that job from
5  AutoLinx?
6  A  Referrals.
7  Q  For the picking up of the car that day,
8  did someone from AutoLinx call you beforehand and
9  ask you to pick up the car as a job?
10 A  Yes.
11 Q  And how would that typically be done when
12 you had a job from AutoLinx?
13 A  I'm notified in the morning that they're
14 going to the auction to buy cars. And then at the
15 auction it's like I call, and I have a list of my
16 dealers who I deal with. And they'll tell me every
17 car that my dealers buy. And I will pick up the
18 cars for my dealers.
19     And then I make my routes like that
20 depending on how many cars this dealer got,
21 location, and then I have to put it together like
22 that to see where I'm going to go to first.
23 Q  And so on this day do you remember
24 approximately what time AutoLinx contacted you
25 about the car pick up job in Tracy?

Page 24

1  A  No.
2  Q  Could it have been the day before?
3  A  Could have been, but I don't remember.
4  Q  Can you give a general description of what
5  you do when you go to one of these auctions to pick
6  up a car?
7  A  I just -- I go and I go to the front desk,
8  and I just say my company name. There will be an
9  envelope with all the gate releases of all the cars
10 from my dealers that I have. I take the gate
11 releases go into the lot, go get whatever -- how
12 many cars it is, pull them out and load up my
13 truck.
14 Q  And so you did -- so the same basic
15 practice at both Tracy and Hayward auction?
16 A  Yeah. Everything, everywhere.
17 Q  And on the day of the incident, did you
18 come across any difficulty when you were at the
19 Tracy auction for your pick up job?
20 A  No.
21 Q  How about at the Hayward auction?
22 A  No.
23 Q  So everything went as is typical at those
24 jobs?
25 A  Yes.

Page 25

1  Q  And so after the Hayward auction, did you
2  go anywhere else before you began towing the cars
3  to the AutoLinx?
4  A  No.
5  Q  So you went directly from Hayward auction
6  to AutoLinx?
7  A  Vallejo, yeah.
8  Q  And approximately how long is the drive
9  from Hayward auction to the AutoLinx?
10 A  35, 40.
11 Q  Minutes?
12 A  Yeah, minutes.
13 Q  So on that day you were performing work as
14 Anderson Auto Transport, correct?
15 A  Yes.
16 Q  And when you were doing work for auto --
17 excuse me -- for Anderson Auto Transport, did you
18 have any form of a kind of records management
19 system in place?
20 A  How I kept track of my services?
21 Q  Yes.
22 A  Yeah. I had, like, QuickBooks.
23 Q  QuickBooks?
24 A  And with different accounts, bill of
25 lading.

Page 42

1  to drop the cars off. I don't know the name of the
2  street, though.
3      Q   So you were actually -- was it like an
4  unprotected left turn?
5      A   It's a -- I don't know what unprotected
6  mean, but it's a right turn.
7      Q   Okay. So it was a right turn, and you're
8  waiting for the roadway to clear?
9      A   No. I'm just stopping at the stop at the
10 construction stop sign, and then I'm taking off.
11 There's no -- there's no -- I'm just stopping.
12 Like I say, it's a stop sign on Sonoma only because
13 they're doing construction, so I just stopped at
14 the stop sign, and then I'm pulling up to the
15 dealership.
16     Q   So there was construction going on
17 basically on the same block as the dealership?
18     A   On Sonoma, yes.
19     Q   And so you were stopped. Was there a
20 construction worker with a sign held up?
21     A   I don't remember if it was a sign or it
22 was a -- if it was a person, but it was a stop.
23     Q   Okay. And at that time -- so that was the
24 first time you saw an officer in Vallejo on that
25 day, correct?

Page 43

1      A   Yeah.
2      Q   And what did he say to you?
3      A   He told me to pull over.
4      Q   Okay. And how did you respond?
5      A   I asked him why.
6      Q   Okay. Then after that, what happened
7  next?
8      A   He told me because I told you to pull
9  over.
10     Q   Okay. And then what happened?
11     A   I asked him why again.
12     Q   Okay. So you asked why twice?
13     A   Yes. I asked him why again.
14     Q   Okay. And then -- then what happened?
15     A   I told him that I'm going right there to
16 AutoLinx.
17     Q   So the first time -- so this is the first
18 time you spoke to an officer, and you were on the
19 corner right before you turn to AutoLinx?
20     A   Yes.
21     Q   So once you told the officer that you're
22 just going around the corner, what did -- what
23 happened next?
24     A   I told him that I'm going -- I told him --
25 he told me to pull over. I told him I'm going

Page 44

1  right there to AutoLinx to drop off these cars.
2  And after I said that, I asked him why once or
3  twice, and I drove up and I pulled over to AutoLinx
4  and proceeded to drop off the cars.
5      Q   And when you started to move again,
6  started to drive, where did the officer go? Was
7  he -- did he drive alongside of you? Was he on a
8  motorcycle?
9      A   Yes.
10     Q   When he's on the motorcycle, did he drive
11 alongside you, or where did he go?
12     A   He stayed there.
13     Q   He just stopped?
14     A   He was already stopped. I'm -- my truck
15 is running at the stop sign. I only pulled up to
16 two stops. I mean, I don't know what he was doing
17 already.
18     Q   So when you just pulled up to the
19 construction area, could you actually see him
20 parked?
21     A   Yes.
22     Q   And where was he parked in relation to
23 where your vehicle was? Was it to the left or to
24 the right?
25     A   Passenger.

Page 45

1      Q   So he was on the passenger side?
2      A   Yes. Right side passenger side.
3      Q   And he was talking to you through the
4  passenger window?
5      A   Yes.
6      Q   Okay. And was the passenger window rolled
7  down?
8      A   Yeah, enough.
9      Q   Okay. And so you pull up and over right
10 next to the AutoLinx?
11     A   It's a street. I don't know the name of
12 the street.
13     Q   Well, I'm saying next to like in front of
14 AutoLinx, the dealership?
15     A   Yes.
16     Q   And approximately how long between the
17 time that the officer spoke to you to the point you
18 were able to pull over in the final parking space
19 for your vehicle?
20     A   How long is it from the officer -- the
21 distance from the officer speaking to me to where I
22 pulled over?
23     Q   Well, how long in time?
24     A   Few minutes. It wasn't far away. Two,
25 three minutes and I was already there at the

Page 46

1  dealership.
2  Q  You were already at the intersection,
3  correct?
4  A  Yes.
5  Q  So it took several minutes for you to just
6  turn right, and you were right there at the
7  dealership?
8  A  Yeah.  From where the officer was on my
9  right, I could see the dealership up ahead.  And
10 all I had to do was just pull up and pull over to
11 the right, and I was at the dealership.
12 Q  Okay.  So what was happening for those few
13 minutes in that time?
14 A  Nothing was happening.  I was just driving
15 whatever, that few couple of minutes to the
16 dealership.
17 Q  So I might be misunderstanding just
18 because -- maybe we'll do it by distance.
19     Can you estimate for me about how far from
20 the point that you were parked at that time to the
21 area that you ultimately parked after interacting
22 with the officer?
23 A  About a block.
24 Q  It was about a block?
25 A  Yeah.  At the most about a block.

Page 47

1  Q  So you were at the intersection of Sonoma.
2  The cross street was the cross street for the
3  AutoLinx, the frontal space of the AutoLinx?
4  A  Yeah.  The cross street?
5  Q  Yes.
6  A  Because I have to drive past it and pull
7  to the right?
8  Q  Yes.
9  A  Yes.  Because it sits on the corner.
10 Q  Okay.
11 A  And you just drive up and just pull over
12 to the right.
13 Q  So it's just pull up and turn to the
14 right, and you -- where you were in a resting or a
15 stopped position where the construction was going
16 on, was that a four-way intersection too, or was
17 that --
18 A  No.
19 Q  -- before?
20 A  That was -- it was a straight road,
21 whatever.  There was no -- they was just stopping
22 maybe -- I don't know why they stopped -- put a
23 stop sign there, but there was a stop, you know
24 what I mean? -- for whatever construction reasons.
25 Q  Okay.  So when you pulled over, the

Page 48

1  officer, was he on his motorcycle?  When you
2  started to go, did you see him on his motorcycle at
3  all?
4  A  He was just straddling it.  When he told
5  me to pull over, he was sitting on it.  He
6  wasn't -- I didn't see him moving or nothing.  When
7  I pulled off, he was still sitting there.
8  Q  Okay.  And prior to that, did you see any
9  flashing lights or did you hear any sirens?
10 A  No.  I didn't notice no sirens or nothing
11 until I got to the side of the dealership.
12 Q  After you -- when you started to drive
13 towards the AutoLinx, did the officer turn on a
14 siren or turn on his lights?
15 A  No.  I didn't -- I didn't see -- there was
16 no sirens or nothing of that sort until I got out
17 and started to unload my trailer on the side of the
18 dealership.
19 Q  Okay.  And so when you pulled over, was
20 the officer on the motorcycle?  Did he follow you?
21 A  He was at the rear of the -- he was at the
22 rear of the trailer, like the end of the block.
23 Because when you make the corner, I'm pulled on the
24 block, and he's like sitting at the top.
25 Q  Okay.  And at that point it was -- was he

Page 49

1  the only officer?
2  A  Seconds or whatever later, then like more
3  officers came.
4  Q  So you were already on the side of the --
5  or parked.
6  A  Yes.
7  Q  You had the motorcycle officer there.  And
8  at that point did he have his lights on?
9  A  I don't remember.  I only remember lights
10 when the cars came.
11 Q  Okay.
12 A  Police cars.
13 Q  So then at that point after pulling over
14 and the officer who was on the motorcycle, when you
15 pulled over, what did you do?
16 A  I was just unloading my cars.  I was
17 working.
18 Q  So you exited the vehicle?
19 A  Yes.
20 Q  Okay.  So you exited the vehicle because
21 you wanted to work?
22 A  Yes.
23 Q  Okay.  At that point when you exited the
24 vehicle, had the other officers already arrived,
25 the cars?

Page 50

1  A   The other officers didn't arrive till like
2  I got to almost making my way to the rear of the
3  trailer.  That's when they came.  I was already out
4  of my truck.
5  Q   And what were you doing at that moment?
6  A   When the other officers arrived, they
7  jumped out with their guns.  I just put my hands up
8  and told them I'm just working.  I didn't know what
9  was going on.  I'm just repeatedly telling them I'm
10 just working.
11 Q   And in that time what did the motorcycle
12 officer do?  What was he doing?
13 A   At that time all of them looked the same.
14 I don't know which one was the motorcycle cop,
15 which one was the regular car cops.  They all was
16 just pointing guns on me.  And all I was doing was
17 trying to unload the cars.
18 Q   And so when you got out of the vehicle,
19 did you hear the motorcycle officer say anything to
20 you?
21 A   No.  Not the motorcycle officer.
22 Q   Did you say anything when you exited the
23 vehicle to the motorcycle officer before any of the
24 other cars arrived?
25 A   All I told him is I'm just trying to work,

Page 51

1  I'm trying to unload these cars.
2  Q   And you said that to the motorcycle
3  officer?
4  A   That's all I said to everybody.  Just I'm
5  trying to unload these cars.  I'm just trying to
6  work.
7  Q   Okay.  So you were at the rear, near the
8  very end of the car --
9  A   Car.
10 Q   -- where the cars were that you had on the
11 trailer.
12 A   The middle of the trailer.
13 Q   So you were in the middle part?
14 A   Of the trailer.
15 Q   The motorcycle officer was parked at the
16 very end?
17 A   Rear of 48-foot long trailer.
18 Q   And when you first saw him again after you
19 were walking, what was -- was he -- did he already
20 have his gun drawn when you first saw him?
21 A   No.  The only time the guns came out when
22 the car police came, the policemen in cars.
23 Q   Okay.
24 A   And then maybe he pulled his thing out,
25 maybe by then.  But all of them looked the same by

Page 52

1  then.  I don't know which one was in a car,
2  whatever.  But I know when the car police pulled
3  up, they all jumped out with guns out.
4  Q   And so they pulled up, and this was within
5  seconds, correct?
6  A   Yeah.  It was a short period of time.  I
7  don't know, like, exactly.  But, yeah, probably two
8  minutes at the most.
9  Q   Two minutes while you were -- so when you
10 were -- sorry.
11     So two minutes from the point when you
12 first exited the vehicle?
13 A   Yes.  After I got out the vehicle, after I
14 was already out of my -- after I got out my truck,
15 it was only that one motorcycle cop.  As I started
16 making my way to unload the cars, that's when the
17 police car cops start coming.
18 Q   And in those two minutes there was -- you
19 were just saying to the --
20 A   No.  I'm working on unloading my cars.
21 Q   And in that two-minute time frame, the
22 officer on the motorcycle, was he doing anything at
23 all that you could observe?
24 A   He was -- he was at, like I said, the rear
25 of my trailer.  All I was telling him was that I'm

Page 53

1  just trying to work, and I'm just trying to unload
2  these cars.
3  Q   And did he say anything in response?
4  A   If he did -- like I said, he's all the way
5  at the rear of the trailer.  I'm 25 feet into the
6  trailer.  He's at the rear of the trailer.  So if
7  he did say anything, I can't hear him.  I'm just
8  unloading these cars.
9  Q   And did he tell you why he pulled you over
10 at any point?
11 A   He never told me why.
12 Q   And have you at any point come to
13 understand why you were pulled over?
14 A   Never knew.  I even went to court.  They
15 dismissed it, so I don't know why I was pulled
16 over.
17 Q   Okay.  So you understand criminal charges
18 were brought against you at some point?
19 A   I know I went to court for something, but
20 it was dismissed.  So I guess there was no charges.
21 Q   Did you have an attorney appointed for
22 you?
23 A   No.
24 Q   Did you ever receive any sort of court
25 filings in relation to a criminal matter in

Page 54

1  relation to this incident?
2      MR. ODIWE: Objection. Vague.
3      THE WITNESS: Only just me going to court
4  that one time.
5  BY MR. SMYTH:
6    Q  And -- okay. We'll get more to that.
7      So approximately two minutes, you're
8  working on the cars.
9    A  Yes.
10   Q  And in that two minutes, what were you
11 doing?
12   A  Just -- I don't know if you know, but
13 these cars have ratchets on them. They're like
14 straps. You just push a button, hit the ratchet,
15 and the car comes loose.
16   Q  And what -- in order to do that, do you
17 need any tools or --
18   A  Just your hands.
19   Q  Your hands?
20   A  Yeah.
21   Q  And what happens to the cars when you're
22 doing that, when they're strapped in?
23   A  You're unstrapping them. So I'm really --
24 the strap secures them to the trailer, so I'm
25 unhooking them from the trailer. So it's two cars.

Page 55

1  You start from the middle and work your way back.
2  So I was starting on the middle car, before
3  everything happened, working my way to the rear.
4    Q  Okay. And do you typically wear gloves
5  for that, or --
6    A  Yes.
7    Q  -- is it just bare hands?
8    A  No. No. No. I wear gloves.
9    Q  Okay. And where do you typically have
10 those gloves?
11   A  In my box.
12   Q  In your box?
13   A  Yeah.
14   Q  So before you went to the -- to unload
15 that, did you go to your box?
16   A  Yes.
17   Q  And did you get the gloves from the box?
18   A  Yes.
19   Q  And at any point did any officer ask you
20 not to go to the box?
21   A  No.
22   Q  So was that something you did within that
23 initial two-minute time frame --
24   A  Yeah.
25   Q  -- when the motorcycle officer was there

Page 56

1  and you began to do your job?
2    A  Yes.
3    Q  So when the other officers arrived, so you
4  had your gloves on?
5    A  Yes.
6    Q  And you -- what was the first thing
7  that -- did they say anything to you?
8    A  They told me to put my hands up.
9    Q  And at that point they had their guns
10 drawn?
11   A  Yes.
12   Q  And where were the officers -- were
13 there -- how many cars came?
14   A  I don't know. It was a lot. I don't
15 know. Six.
16   Q  Six cars?
17   A  Yeah.
18   Q  So six cars arrive, six police cars. And
19 where were they -- the officers positioned?
20   A  Like on the driver's side of the trailer.
21 Like I said, with every carload, the driver,
22 middle, rear in the street part.
23   Q  So did they kind of position themselves
24 kind of circling your area? Does that make sense?
25 Or did they -- they were all kind of back behind

Page 57

1  the trailer kind of where the motorcycle guy was?
2    A  The cars was there, but they were moving
3  forward to me to where the trailer is.
4    Q  Okay.
5    A  They pulled up to the rear of the -- you
6  know what I mean? -- the trailer block, whatever.
7  They pulled up to the rear there, but they bounced
8  out and walked straight to me.
9    Q  So they exited the vehicles so they -- let
10 me just kind of summarize, and tell me if I got it
11 right.
12     So approximately six cars, did they arrive
13 together, or was it --
14   A  I think in the beginning it was like three
15 cars, three cop cars, and then there was a lot of
16 cars.
17   Q  So the first group of cars maybe three?
18   A  Mm-hmm.
19   Q  Okay. So three cars, approximately,
20 arrive, and they park kind of at the end of your
21 trailer?
22   A  Yeah. And whatever that street called and
23 this trailer.
24   Q  Okay. And then you said they bounce out.
25 That means they --

15 (Pages 54 to 57)

Page 58

1  A  Yeah. They got out of the car and with
2  their guns out and told me to put my hands up.
3  Q  Where were they positioned? You said --
4  well, how many officers were there total? Can
5  you -- approximately at that point?
6  A  At least six officers. I know for sure
7  three, but it was -- in the end there was a lot of
8  officers.
9  Q  No. I'm just talking about that point.
10  A  At least three to four officers.
11  Q  So three to four officers, and then they
12  got out of the car. And when did you first -- what
13  was the -- did you first see that they were doing?
14  A  Well, I seen they had their guns out, so I
15  just put my hands up. And I was just explaining to
16  them over and over, you know, I'm just working.
17  That's all I was saying, and I'm just working.
18  Q  Okay. So you have your hands up. And
19  what were they saying, or were they making
20  commands?
21  A  They told me to put your hands up, so
22  that's what I did.
23  Q  So you put your hands up as soon as the
24  officers arrived and pulled their guns out?
25  A  As soon as I seen the guns, I had my hands

Page 59

1  up.
2  Q  Then after you had your hands up, you had
3  the guns on you, positioned and pointed at you,
4  what happened next?
5  A  Well, my hands up, and either they had the
6  guns pointed at me or out of the number of
7  officers, three of them had Tasers pointed at me
8  because they shot me with three Tasers. So I don't
9  know exactly which officer, but they hit me with
10  three of them. Because when they hit me with the
11  Tasers, they wanted me to get on my stomach. So
12  when they shot me with the Tasers, I fell on my
13  back.
14      And then while the things was -- the
15  Tasers was in me, they were either hitting the
16  trigger or something like that, but they were
17  shocking me while I was on my back, and they was
18  telling me to get on my stomach, and I couldn't
19  move.
20      So I believe that's when they jumped on
21  top of me and kept tasing me and telling me to get
22  on my stomach, but I couldn't get on my stomach.
23  Q  Okay. So you said -- when -- you said you
24  were hit with three Tasers?
25  A  Yeah.

Page 60

1  Q  And that -- so you understand that three
2  officers there had different -- they all shot their
3  Tasers approximately at the same time?
4  A  I don't know. That's how many -- that's
5  how many -- whatever it's called -- like impacts or
6  whatever I felt.
7  Q  So you felt Tasers in three different --
8  A  Areas.
9  Q  -- points?
10  A  Yeah.
11  Q  Where did you feel the Tasers come into
12  contact with you?
13  A  I got hit in the leg, all on my right
14  side, my right leg, my -- this forearm. I got hit
15  right here on the shoulder/chest (indicating).
16  Q  The shoulder/chest on which side?
17  A  Everything right side.
18  Q  So the right side -- oh, so everything --
19  everywhere you got hit -- so right leg, right --
20  A  Just forearm.
21  Q  -- forearm area and the right
22  shoulder/chest area?
23  A  Yeah.
24  Q  And is that -- so the officers, were they
25  positioned kind of to the right of you?

Page 61

1  A  They were standing right in front of me.
2  Q  They were standing in front of you, and
3  the Tasers kind of went to the right.
4  A  Yeah. Because the -- you stand the
5  trailer like this. I'm standing on the side, so
6  they're at an angle towards me. You know what I
7  mean? I'm standing -- I'm opening up towards them.
8  You know what I mean? And they're at an angle
9  facing at me with my back to the trailer.
10  Q  So the first Tasers, do you know which
11  one -- which impact you felt first, or was it all
12  kind of the same thing?
13  A  Yeah. I don't know exactly which.
14  Q  Okay. And the Tasers, they have kind of a
15  setting that, you know, actually shoots the little
16  prongs out.
17      Do you recall actually physically or
18  visibly seeing the prongs coming out?
19  A  Yes.
20  Q  And was that out of each of the Tasers?
21  A  Yes. The -- the ones went in my leg, the
22  ones there got -- I think the person who shot me in
23  the leg when I fell, it got snatched out. You know
24  what I mean? They pulled it out of my leg. The
25  ones in my upper arm, the upper area stayed in me.

16 (Pages 58 to 61)

Page 62

1  They're the ones that was still in me.
2    Q   Okay. So the one that was in your right
3  leg, whoever shot the Taser just immediately pulled
4  it out of you?
5    A   Somehow or I don't know, but them ones
6  didn't -- them ones didn't stay in me. The ones in
7  my upper body stayed in me.
8    Q   So the two -- the right side prongs for
9  your forearm and your --
10   A   Chest.
11   Q   -- chest area?
12   A   Shoulder/chest.
13   Q   Shoulder/chest. Okay.
14       And then do you recall anything about
15  the -- the physical appearance of any of the
16  officers involved?
17   A   Physical appearance?
18   Q   Yeah. Their face. Did you -- would you
19  recognize them if you saw them again?
20   A   No, not really. It was just happening so
21  fast. When you're getting shocked, I didn't see
22  nothing. You know what I mean? I'm just trying to
23  hold on tight.
24   Q   Seen the uniforms?
25   A   Yeah, that's it.

Page 63

1    Q   Yeah. Okay. In the -- so approximately
2  how long from the point the officers first came on
3  the scene, the three cars or so, and then to the
4  point where you're actually tased the first time?
5    A   Oh, from when they pulled up to when I
6  got -- they tased me quick. How long they tased
7  me, that seemed like a long time. I mean, it
8  probably wasn't that long, but it felt like they
9  was tasing me while I was on the ground for a long
10  time.
11   Q   So to get kind of a sense of -- you said
12  it happened quick. And, you know, understandably,
13  it's kind of a rapidly developing situation.
14   A   Yeah.
15   Q   But if you can estimate for me about that
16  time between when the officers arrived and the --
17  you know, within seconds or, you know, 30 seconds,
18  a minute, you know, between the time the officers
19  pulled up with the Tasers out and the time that you
20  were actually tased.
21   A   It had to happen within less than a minute
22  to when they tased me.
23   Q   Okay.
24   A   When they pulled up and someone shot me or
25  whatever, tased, yeah.

Page 64

1    Q   So it was less than a minute; could it
2  have been less than 30 seconds?
3    A   Somewhere around there.
4    Q   Okay. And in that, you know, time frame,
5  do you recall any other commands being issued,
6  other than put your hands in the air?
7    A   Yeah. After I got tased, they kept
8  telling me to get on my stomach. And that's all I
9  remember.
10   Q   So I'm just focusing on the time frame
11  before the first time you were tased.
12   A   That's the only commands I ever got was to
13  get on my stomach.
14   Q   Okay. I think you did say put your hands
15  up at one point?
16   A   Yeah. Put your hands up. That's when
17  they jumped out. Initially, they said put your
18  hands up. And then they said get on your stomach.
19  After that they was tasing me.
20   Q   Did they -- and at any point did you use
21  any curse words, derogatory statements towards the
22  officers?
23   A   No. Only thing I told them was I'm just
24  trying to work. But when they pulled up and they
25  pulled their guns out, all I was trying to explain

Page 65

1  to them is that I was just working.
2    Q   Did it upset you at all that they were
3  trying to pull you over, someone wanted to pull you
4  over?
5    A   It upset me the fact that, for one, I was
6  being tased, and I don't know why; for two, like
7  you say, I was being pulled over, and I don't know
8  why. And, like I said, I'm upset just because I'm
9  just working, and I'm being treated like this.
10   Q   And were you upset at the time before
11  the -- before you were tased, were you upset?
12   A   No. When I told him that I was just
13  working and I pulled up and continued working, I
14  thought it was -- I thought it was done or
15  whatever. I don't -- you know what I mean? I knew
16  I didn't do anything wrong, so I had no reason to
17  be upset.
18   Q   And in your mind, I understand you say
19  that you weren't doing anything wrong.
20   A   Mm-hmm.
21   Q   Are you -- did anyone ever tell you after
22  the fact anything with regard to laws related to
23  business identification, information on the side of
24  a business vehicle?
25       MR. ODIWE: Objection. Vague. Calls for

Page 66

1  speculation. Lacks foundation.
2       THE WITNESS: No, no one never. When I
3  went to court, I thought they would tell me that.
4  When I went to court, I found out I didn't do
5  anything wrong. I still feel like I didn't do
6  anything wrong.
7  BY MR. SMYTH:
8     Q  And did someone tell you that you didn't
9  do anything wrong when you went to court?
10    A  When I went to court, I was accused of
11 whatever they had listed that day. And they
12 dropped the charges, so that's why I felt I didn't
13 do anything wrong.
14    Q  Did you ever come to find out the -- well,
15 did you ever come to find out any reason why the
16 charges were dropped? Did anyone ever tell you
17 anything about that?
18    A  No.
19    Q  So you were tased in approximately three
20 different locations for that first -- when -- you
21 know, the first instant of the officers tasing you?
22       MR. ODIWE: Objection. Misstates the
23 prior testimony.
24       THE WITNESS: I don't understand the
25 question.

Page 67

1  BY MR. SMYTH:
2     Q  So let me try that again. So you had
3  mentioned that you were tased in three locations,
4  correct?
5     A  Yes.
6     Q  And all of them occurred essentially at
7  the same time, correct, that first time?
8     A  Yeah. I could remember -- I remember the
9  Taser going off. It sounded like a gunshot because
10 I can remember the bangs. You know what I mean? I
11 don't know which spot hit first because them things
12 move fast.
13    Q  You had -- well, did mention that it
14 all -- those three -- the one that hit your right
15 leg, the right side of your forearm, and the
16 shoulder/chest area, they all occurred relatively
17 within the same time frame, correct?
18    A  Yes.
19    Q  And so I'll refer to that as the first
20 instance of you being tased, all of that coming
21 together at the same time.
22       Do you understand if I refer to it in that
23 respect?
24    A  Yes.
25    Q  Okay. Were you tased again after that?

Page 68

1     A  While I was on the ground.
2     Q  Okay. So that's -- yeah. So I'm -- and
3  that's what I'm trying to get at. I'm
4  distinguishing the instances or time frames in
5  which you were tased, and then if these first
6  instance is these three.
7     A  Mm-hmm.
8     Q  And then you hit the ground, and then you
9  were tased again at some point, correct?
10    A  The definition of tase is when they're
11 shocking you or when they're hitting you?
12    Q  So I'll refer to it as this is the first
13 instance of being tased. And then I think the
14 technical term is they can -- other cycles of the
15 Taser.
16       Does that make sense?
17    A  Yeah. There was more cycles when I was on
18 the ground.
19    Q  Okay. So how many cycles after that first
20 time do you recall?
21       MR. ODIWE: Objection. Calls for
22 speculation.
23       THE WITNESS: Yeah. I don't know exactly.
24 It was multiple. I can't -- I'm getting shocked,
25 so I'm not counting them. I just know they ain't

Page 69

1  letting go. You know what I mean?
2  BY MR. SMYTH:
3     Q  So we'll try to break it down more. So
4  after that first instance where you were initially
5  tased, what happened?
6     A  I'm -- after I'm tased, I'm like -- as
7  soon as they tased me, I grabbed myself like this
8  (indicating), and I'm just holding on, and they're
9  shocking me. And then that's when -- because
10 that's when another one hit me. Either one of
11 these hit first (indicating). You know what I
12 mean? Because the one in my leg came out or they
13 pulled it out or something like that, because that
14 one didn't stay.
15       So when one hit me first, I'm standing up,
16 and I'm shocked like, and I can't move, but I'm
17 standing. So then they shoot me with another one,
18 either here or here or something (indicating).
19 Then I fall on the ground, but I fall on my back.
20       So while I'm on my back, they're telling
21 me to roll over. And I'm telling them I can't
22 move. So the more I say I can't move, the more
23 that they're putting the cycle, or whatever you
24 call it, putting the -- putting the -- hitting the
25 trigger.

Page 70

1  Q  Okay. So basically -- let me try and
2  summarize it a little bit, and tell me if I'm
3  misunderstanding.
4     So you got hit first in the chest,
5  correct?
6  A  I don't -- this -- just the area. I don't
7  know which one hit first. I got hit in the leg, I
8  got hit in the forearm, and I got hit in the chest.
9  The initial one I was still standing while I was
10 getting shot.
11 Q  Okay.
12 A  I don't know where it was, though,
13 where -- which one it was first. But the first one
14 didn't put me on the ground.
15 Q  Okay.
16 A  You know what I mean?
17 Q  I think what you're -- and tell me if I
18 misheard you. But I thought that you said after
19 getting hit in the chest, you kind of crossed your
20 arms across, and that's when the second one came
21 and hit you in the forearm. Is that --
22 A  These are the locations I got hit. I
23 don't know which one hit me first.
24 Q  Okay.
25 A  But when I got hit first, that's when I

Page 71

1  just clenched like this (indicating). It could
2  have been the one in my leg. But after they hit me
3  once, they shot me two more times.
4     So after they hit me once, I'm standing
5  holding myself. And they shoot me again. That's
6  when I fall. You know what I mean?
7  Q  So three Taser impacts, and it wasn't
8  until the third one that you actually fell to your
9  back; is that correct?
10 A  Yes.
11 Q  So after falling to your back, did you
12 hear any officers make -- issue any commands at
13 that time before another cycle was ran?
14 A  All I remember is get on your stomach.
15 Q  Okay. So you heard -- you do recall
16 orders to get onto your stomach; is that correct?
17 A  Yes. And that's when I was telling them I
18 can't.
19 Q  So you -- in that time frame before the
20 second cycle, you actually stated something to the
21 effect of I cannot do so, I cannot?
22 A  It had to be more than two cycles because
23 I couldn't even move.
24 Q  Okay.
25 A  They was still zapping me. So while

Page 72

1  they're zapping me, they're telling me to roll
2  over. And I can't roll over. So the more that I
3  can't, the more that they're zapping me.
4  Q  So let me just try to dissect it a little
5  bit, you know. And I know it all is happening
6  quickly.
7     So between the first tasing and the first
8  cycle after you were on the ground, there's -- the
9  orders are to get on your stomach, correct?
10 A  Mm-hmm.
11 Q  And you testified that you're saying I
12 can't, correct?
13 A  Yes.
14 Q  And did you say I can't before that second
15 cycle started, or did the cycle occur before you
16 said something and said I can't?
17 A  They would tase me as soon as I hit the
18 ground. They was tasing me when they jumped on top
19 of me --
20 Q  Okay.
21 A  -- like, whatever, cycling me.
22 Q  So as soon as you hit the ground, more
23 current is being cycled through you?
24 A  Yes.
25 Q  And do you recall seeing anything

Page 73

1  happening -- well, strike that.
2     Where were your eyes focused when -- after
3  falling to the ground? What were you looking at?
4  A  I'm looking, like, straight up because I'm
5  just clenched.
6  Q  So straight up like into the sky or like
7  up, out back to the car?
8  A  No. Straight -- straight -- straight,
9  forward or whatever. I'm on my back looking up,
10 straight up.
11 Q  So that would be kind of at the sky?
12 A  Yeah.
13 Q  And so while you're looking up, could you
14 see anything what the officers -- where they were
15 moving or positioning themselves?
16 A  Yeah. That's when I hit the ground.
17 That's when they jumped on me with their knees
18 telling me to roll over.
19 Q  So you're looking up, and then they jumped
20 on you?
21 A  Yeah.
22 Q  And at the time that they were jumping on
23 you, were you still having the cycles running
24 through you at the same time?
25 A  Yes.

19 (Pages 70 to 73)

Page 74

1  Q   Were any of the officers striking you at
2  the time that the cycles were going on?
3  A   Yes. To get me to roll over on my
4  stomach.
5  Q   And they're striking you. Did you see
6  what they're striking you with?
7  A   Just hands and knees and legs.
8  Q   So their body parts, their arms or
9  their -- strike that.
10      Their hands, elbows and knees?
11  A   Yes.
12  Q   And where are they hitting you on your
13  person?
14  A   On my upper area.
15  Q   Anywhere that you can recall in
16  particular?
17  A   My chest, my neck, my shoulders, my --
18  because I'm clenched, I'm like this (indicating), I
19  can't move. You know what I mean?
20  Q   Mm-hmm.
21  A   So they're trying to move me on their own.
22  Q   And you're clenched because you're
23  being --
24  A   Yeah. I'm being cycled.
25  Q   Okay. So approximately -- well, can you

Page 75

1  estimate for me how long it was that the officers
2  had started to use their fists and strike you to
3  get you onto your back?
4  A   It felt like minutes.
5  Q   Okay. Can you say whether it was minutes
6  or it just felt like minutes?
7  A   Yeah. At least, like, three to four
8  minutes, if not more, they was on top of me.
9  Q   And at this time approximately how many
10 officers were involved in trying to get you onto
11 your -- onto your stomach?
12 A   At least eight or nine. It was a lot of
13 officers.
14 Q   So eight or nine officers were within
15 three to four minutes involved in striking you to
16 get you to move to your stomach.
17 A   It's eight or nine officers, like, in the
18 vicinity, like -- you know what I mean? It's a lot
19 going on. Striking me, there was probably, like,
20 three -- three officers on top of me.
21 Q   So about three officers are on top you
22 trying to get you onto your stomach and cuff you
23 basically?
24     MR. ODIWE: Calls for speculation.
25     THE WITNESS: Yes.

Page 76

1  BY MR. SMYTH:
2  Q   And you had then other officers around.
3  Could you tell, you know, who was cycling at that
4  time?
5  A   Yes.
6  Q   And who was that or --
7  A   I can't -- I don't know their names now.
8  But I could see the ones cycling me. And the ones
9  cycling me aren't the ones on top of me. So the
10 ones with the wires in me are still cycling me, and
11 then the ones jumping on me are, like, I guess, new
12 cops or whatever, the partners or something like
13 that.
14 Q   Okay. All right. So -- so you -- I mean,
15 I think through your testimony, I kind of got a
16 sense that you can't tell exactly how many times
17 you were cycled, correct?
18 A   Not counting. I just know it was for a
19 long period of time.
20 Q   Okay. So at some point you were placed in
21 the handcuffs, correct?
22 A   Yes.
23 Q   How many officers actually were involved
24 in cuffing you?
25 A   One.

Page 77

1  Q   Just one? Have you -- at the time you
2  were being cuffed, what were the other officers
3  doing?
4  A   Looking through my stuff.
5  Q   So by that point they had started
6  searching your vehicle?
7  A   Yeah. You mean after I'm being cuffed or
8  the process of being cuffed?
9  Q   While you're being cuffed.
10 A   Oh, while I'm being cuffed, it only took
11 one officer. I wasn't resisting. They didn't have
12 a problem putting the cuffs on me. The only time
13 they had a problem was when they were shocking me.
14 Q   So the cuffing itself didn't take --
15 A   One officer.
16 Q   And it didn't take much time?
17 A   No.
18 Q   So at that point once you were cuffed,
19 what was the first thing that you recall after that
20 time?
21 A   Just they put me up against the car, and I
22 just watched them run through my truck and stuff.
23 Q   And so you were brought to one of the
24 patrol vehicles?
25 A   Yes.

Page 106

1  the -- you know, being arrested at the scene at the
2  dealership still.
3    Q  Okay. The information on this Notice to
4  Appear form, did you review it before you signed it
5  at the bottom?
6    A  No. Everything -- after being tased and
7  jumped on and all that, I didn't read none of this.
8    Q  Did anyone when they were filling this out
9  explain what it was?
10   A  No.
11   Q  In the center area there are a few
12 descriptions and an area to fill in codes and
13 sections.
14      Do you see where I'm referring to?
15   A  Yes.
16   Q  Did you ever review that information
17 either before or after executing this?
18   A  No.
19   Q  And it was given to you, you said, at the
20 scene of the incident; is that correct?
21   A  Yes.
22   Q  At what point did someone give this to
23 you, when you were in the car?
24   A  That's when I was in handcuffs.
25   Q  And so when they handed it to you, how did

Page 107

1  you receive it?
2    A  Either I had to sign in handcuffs, and
3  they put it into my pocket with me because they
4  didn't give it to me at the police department. I
5  didn't get anything when I left the police
6  department.
7    Q  So you signed this document while you were
8  cuffed behind your back?
9    A  Either in cuffs at the scene or this --
10 this had -- the signature, this had to happen from
11 the scene of the crime -- I mean from the scene to
12 the hospital. That's the only place. Other than
13 that I didn't get no -- even the time states it was
14 at 1:50. I'm still at the dealership.
15   Q  So after receiving this document, what did
16 you do with it?
17   A  That's what I -- I believe I was -- I
18 signed it, and I believe someone put it in my
19 pocket maybe, because I don't remember having this
20 document, period. The only time I knew about a
21 court date was when it was mailed to my house. So
22 when this was signed and everything, this had to be
23 in the commotion of being tased, jumped on,
24 transported. It had to be then because I don't
25 remember having the ticket at all.

Page 108

1    Q  Okay. The date at the bottom, can you --
2  it looks like August 18, 2015. Do you see that?
3    A  Yes.
4    Q  Is that -- do you have any recollection of
5  that being the date that you appeared at court?
6    A  No. I don't know if that's the same date
7  that it was mailed to me.
8    Q  And approximately how long after the
9  incident did you -- was it before you appeared at
10 court?
11   A  Maybe about two or three months later.
12   Q  So that could be correct, but you just
13 don't know, as you sit here today?
14   A  Yes.
15   Q  Okay. Do you have the -- did you retain
16 any of the paperwork that you received regarding
17 notifying you to appear at court?
18   A  No.
19   Q  What did you do with that?
20   A  I went to court with it.
21   Q  And after taking it to court, what did you
22 do with that paperwork?
23   A  After they made the judgment and cleared
24 me of this stuff, I don't know, I probably got rid
25 of it.

Page 109

1    Q  Do you know if there was an actual
2  judgment?
3    A  I know that they said I was acquitted of
4  these -- these failure and resisting and display of
5  trademark. I didn't have any fines, no nothing.
6    Q  And who was it that told you that?
7    A  The judge on that date or whatever date
8  that was that I went to court.
9    Q  So after you were released, what did you
10 do on the day of the incident?
11   A  I walked all the way back to the
12 dealership to see if my truck was there.
13   Q  Approximately how far was that; do you
14 recall?
15   A  I don't know. From Benicia street to
16 Sonoma, I don't know. I don't know. Five, seven
17 blocks. I don't know. It was a long distance.
18   Q  Did you have a phone with you?
19   A  Yeah, I had my phone.
20   Q  Did you call anybody?
21   A  Probably called, talked to my daughter.
22   Q  Do you recall what you spoke about?
23   A  I just -- I was emotionally just upset.
24   Q  Did you pay anything out-of-pocket for
25 your treatment at the Kaiser Hospital on the day of

Page 110

1  the incident?
2      A   I think they sent a bill.
3      Q   Do you recall approximately how much?
4      A   No. I don't recall.
5      Q   How long after the incident before you
6  began -- when did you consider or begin considering
7  filing a complaint against the city?
8      A   I don't remember the exact date.
9      Q   Well, approximately how long after the
10 incident? Was it a matter of days, weeks, months?
11     A   No. I don't remember. Maybe weeks. It
12 wasn't that far after. But it could have been a
13 few weeks. It wasn't like the next day. It wasn't
14 nothing like that, but I don't remember exactly.
15     Q   Before speaking to any attorneys about the
16 incident, did you speak to anyone else about your
17 decision to pursue a lawsuit against the city?
18     A   No. I didn't speak to no one.
19     Q   And at some point you retained the Burris
20 law firm, correct?
21     A   Yes.
22     Q   Approximately how long after the incident
23 before you retained the Burris law firm?
24     A   I think it was a couple -- maybe some
25 weeks. I don't know exactly how long it was. It

Page 111

1  wasn't like the next day. I know it had to be a
2  little bit of time.
3      Q   Did you receive any referral to the Burris
4  firm, or were you just familiar with them?
5      A   Yeah. No referral. Yeah, just familiar.
6          MR. SMYTH: Okay. Let me look over my
7  notes. We're getting to that point. Let's go off
8  the record just for --
9          THE VIDEOGRAPHER: The time is
10 approximately 4:29 p.m. Off the record.
11         (Whereupon, a brief recess was had.)
12         THE VIDEOGRAPHER: The time is
13 approximately 4:32. On the record.
14 BY MR. SMYTH:
15     Q   I'm going to go over a few officer names.
16 You tell me if they sound familiar at all.
17         The name James Melville, does that sound
18 familiar to you at all?
19     A   No.
20     Q   How about Joe -- Joseph Coelho?
21     A   No.
22     Q   Robert Herndon?
23     A   No.
24     Q   And you've mentioned you've been pulled
25 over before. In those -- any of those prior

Page 112

1  incidents, did you actually exit the vehicle?
2      A   No.
3      Q   Is there a reason you didn't exit the
4  vehicle during those prior -- any of those prior
5  traffic stops?
6      A   The ones we stated was a taillight, so
7  that was fix-it ticket. The other ones is DOT
8  inspection. You don't exit. You just sit there,
9  let them -- they check your stuff, check your
10 paperwork, all that stuff, check your trailer,
11 check your brakes.
12     Q   In your -- in any driving school or any
13 other training or anything with regard to your
14 mechanics vocational training, did it ever come
15 to -- strike that.
16         Have you ever come to understand from any
17 means that exiting your vehicle during a traffic
18 stop is in any way a bad idea?
19         MR. ODIWE: Objection. Lacks foundation.
20 Calls for speculation. Incomplete hypothetical.
21         THE WITNESS: In the situation when you're
22 pulled over, yes. I wasn't pulled over in this
23 situation. I was just working.
24 BY MR. SMYTH:
25     Q   Did you believe you were not pulled over

Page 113

1  after the officer on the motorcycle told you to
2  pull over your vehicle?
3      A   I believe that all I did was pull into my
4  destination. The officer stayed there, and then
5  they approached me after I proceeded to work.
6      Q   And -- but it was your testimony earlier
7  in this that when the motorcycle officer approached
8  you first, he asked you to pull over your vehicle,
9  correct?
10     A   And I asked him why.
11     Q   And after that point, did you think that
12 for some reason you were not being pulled over?
13     A   No. After I asked him why and he told me
14 because I said so, I proceeded to tell him I'm
15 pulling over out of the way right up, you know --
16 it was only up straight to the right, and that's
17 what I did.
18     Q   And it's -- so just to be clear, after the
19 officer told you to pull over your vehicle, it was
20 your belief that you weren't being pulled over?
21         MR. ODIWE: Objection. Misstates prior
22 testimony.
23         THE WITNESS: When the officer told me to
24 pull over, I'm at a stop sign in a construction
25 zone. There's nowhere to pull over. So that's

Page 114

1  why -- when he told me to pull over, I asked him
2  why.  His response was because I told you to.  You
3  know, so I told you to states that I didn't --
4  there's nothing that I've seen to have done wrong.
5  I asked him why again.  He states because I told
6  you to.  I told him I'm going -- you could see
7  AutoLinx right there.  I said I'm pulling right
8  there.  I'm going to AutoLinx.
9       I can't pull over.  I'm at a stop -- I'm
10 at a construction zone stop sign.  So you can't go
11 left.  You can't go right.  If I pull over, I'm
12 going -- whatever -- I'm going to hit some
13 equipment, you know.  So I pulled up, and I pulled
14 over at the dealership.
15 BY MR. SMYTH:
16    Q   And so according to your testimony, at no
17 point did any other officers pull up behind you in
18 their vehicles; is that correct?
19    A   No, not till I was pulled over at the
20 dealership.  I only seen one police officer at the
21 construction zone, the guy on the motorcycle.  The
22 police -- the motorcycle cop.  I didn't see more
23 police officers until I started to unload my cars
24 at AutoLinx.  That's when cars -- motorcycle -- I
25 mean, that's when police cars came.

Page 115

1    Q   Do you have an understanding or belief
2  that the officer was obligated to tell you why he
3  wanted you to pull over before you pulled over?
4    A   Do I have a belief?  Do I have a -- what?
5    Q   Some understanding because -- do you have
6  any sort of understanding or belief that prior to
7  being pulled over, the officer needs to tell you
8  why he is pulling you over?
9    A   I do believe if an officer pulls you over
10 and you ask him for what reason, they should tell
11 you.  That's what -- I do believe that.  If they're
12 pulling you over -- I was never pulled over
13 initially.  Only thing I did was pull up to a
14 construction stop sign where the officer happened
15 to be at the same time.
16      He was never behind me.  He can't yell
17 from behind me to the front if he pulled over.  He
18 was at my passenger window.  I mean, you know, on
19 the passenger side of my truck, you know.
20   Q   And so with regard to the -- sorry.
21      It was your understanding or belief that
22 at the time that you were asked to be pulled over,
23 you had not done anything against the law; is that
24 correct?
25   A   At the time he asked me to pull over, I

Page 116

1  asked him for what reason, and he told me nothing.
2    Q   And at the time you had been pulled over
3  for something along the lines of a taillight being
4  out, did you know that your taillight was out
5  beforehand?
6    A   When I've pulled over with my taillight
7  out, the police officers behind me with their
8  lights on flashing, so that indicates to pull over.
9    Q   So in this incident, it's your testimony
10 that there was no officer behind you with their
11 lights on before you pulled over?
12      MR. ODIWE:  Objection.  Misstates prior
13 testimony.
14      THE WITNESS:  In this incident there was
15 an officer at the stop sign on the passenger side
16 and he asked me to pull over, and I asked him why.
17 That's what happened in this incident.  It's
18 totally different from a taillight out.
19 BY MR. SMYTH:
20   Q   I'm just -- you know, specific to the
21 lights and sirens for this incident, is it your
22 testimony that you did not observe at any point any
23 lights or sirens indicating a -- indicating to you
24 to pull over before you stopped your vehicle?
25   A   No.  Only thing he told -- he verbally was

Page 117

1  at my window, said pull over, and that's why I
2  asked him why.
3       And I just told him that I was working.
4  And we was in a construction zone, and I told
5  him -- I mean, like I said, AutoLinx was right
6  there, not even a block and a half.  I don't know
7  the exact amount of feet or whatever.  And I pulled
8  up and pulled over to the right.
9       MR. SMYTH:  Okay.  That's it for me.
10 Thank you.
11      THE VIDEOGRAPHER:  All right.  Let me
12 close this out then.  This concludes the
13 December 18, 2018 testimony of Jason Anderson in
14 the matter of Jason Anderson vs. City of Vallejo
15 and others.
16      The electronic record contains two digital
17 media in a file of which lasts approximately 54
18 minutes.
19      Stuart Pettigrew Video will retain the
20 master media of today's testimony.
21      Off the record at 4:41.
22      THE COURT REPORTER:  Normal turnaround?
23      MR. SMYTH:  Yes.
24      THE COURT REPORTER:  Do you take a hard
25 copy and condensed?