**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

--oOo--

JASON ANDERSON,                         )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )CASE NO.: 2:17-CV-00137
                                        )        -JAM-DB
CITY OF VALLEJO, a municipal            )
corporation; ROBERT HERNDON,            )
individually and in his capacity        )
as a Police Corporal for the            )
Vallejo Police Department, JAMES        )
MELVILLE, individually and in           )
his capacity as an Officer for          )
the Vallejo Police Department;          )
JOSEPH COELHO, individually and         )
in his capacity as an Officer           )
for the Vallejo Police                  )
Department; and DOES 1-50,              )
inclusive, individually, jointly        )
and severally,                          )
                                        )
            Defendants.                 )
_____)        CERTIFIED COPY


DEPOSITION OF CORPORAL ROBERT HERNDON

MONDAY, DECEMBER 17, 2018


REPORTED BY:  ADRIANA P. ROBLES, CSR NO. 14212

1

DEPOSITION OF CORPORAL ROBERT HERNDON

```
 1                    I N D E X

 2

 3   EXAMINATION BY:                              PAGE

 4   MR. ODIWE                                      6

 5                    --o0o--

 6

 7   Appearance Page                                3

 8   Exhibit Page                                   4

 9   Location                                       5

10   Declaration of Witness                       104

11   Reporter's Certificate                       105

12   Unsigned Transcript                          106

13   Witness Letter                               107

14   Deposition Errata Sheet                      108

15   Attorney's Notes                             109

16

17                    --o0o--

18

19

20

21

22

23

24

25
```

2

DEPOSITION OF CORPORAL ROBERT HERNDON

```
 1                            APPEARANCES

 2

 3      FOR THE PLAINTIFF:

 4           LAW OFFICES OF JOHN L. BURRIS
             Airport Corporate Centre
 5           7677 Oakport Street, Suite 1120
             Oakland, California  94621
 6           (510) 839-5200

 7           BY:  K. CHIKE ODIWE, ATTORNEY AT LAW
                  LATONIA ROBINSON, LAW CLERK
 8

 9      FOR THE DEFENDANTS:

10           CITY OF VALLEJO
             CITY ATTORNEY'S OFFICE
11           555 Santa Clara Street
             Vallejo, California 94590
12           (916)808-5346

13           BY:  TIMOTHY R. SMYTH, DEPUTY CITY ATTORNEY

14

15

16                            --o0o--

17

18

19

20

21

22

23

24

25
```

3

```
 1              THE WITNESS:  No.
 2    BY MR. ODIWE:
 3       Q.  Okay.  Did you believe that Mr. Anderson was
 4    trying to do his job when initially -- when -- strike
 5    that.
 6              Did you believe that Mr. Anderson was trying to
 7    do his job after you initially approached him on foot?
 8              MR. SMYTH:  Calls for speculation.  Lacks
 9    foundation.  Vague.
10              THE WITNESS:  I can't -- I don't know what his
11    thought was.
12    BY MR. ODIWE:
13       Q.  I'm not asking you to tell me what Mr. Anderson
14    was thinking.  I want to get your thought to while
15    you're perceiving Mr. Anderson's actions.
16              So to that extent, I'm wondering if you
17    subjectively believed that he was trying to do his job
18    when you first approached him?
19              MR. SMYTH:  Lacks foundation.
20              THE WITNESS:  All I know is that he was not
21    compliant to any demands -- any orders that we were
22    giving.  That's my focus.
23    BY MR. ODIWE:
24       Q.  But you did know that Mr. Anderson was driving
25    a truck with the commercial trailer?
```

                                                          40

DEPOSITION OF CORPORAL ROBERT HERNDON

1      A.  Yes.

2      Q.  What did you believe Mr. Anderson was doing?

3          MR. SMYTH:  Vague.  Overbroad.  Lacks

4   foundation.

5          THE WITNESS:   That he was delivering cars.

6   BY MR. ODIWE:

7      Q.  Would it be fair to say that you believe that

8   Mr. Anderson was delivering cars as a part of his

9   employment?

10     A.  Yeah.

11     Q.  And that's something that you knew at the time?

12         MR. SMYTH:  Is that --

13         THE WITNESS:  No, I did not.

14         MR. SMYTH:  Vague.  Hold -- just wait.  Lacks

15  foundation.  Vague.  Go ahead.

16         THE WITNESS:  I mean, you surmise he was doing

17  something with the cars that were attached to his

18  trailer and he had pulled up next to a car sales lot.

19  BY MR. ODIWE:

20     Q.  So apart from transporting cars at a car

21  dealership, what else could he have been doing?

22         MR. SMYTH:  Overbroad.  Vague.

23         THE WITNESS:  Don't know.

24  BY MR. ODIWE:

25     Q.  All right.  But you did not believe he had

41

DEPOSITION OF CORPORAL ROBERT HERNDON

```
 1        A.  That was one of the possibilities.

 2        Q.  And that was a possibility that was in your

 3   mind at the time you began to apprehend Mr. Anderson?

 4            MR. SMYTH:  Objection.  Misstates testimony.

 5   Lacks foundation.  Go ahead.  If you can.

 6            THE WITNESS:  That was one of the

 7   possibilities -- reasons of why he failed to yield.

 8   BY MR. ODIWE:

 9        Q.  Okay.

10        A.  There's numerous others that went through my

11   mind in a span of a short time.

12        Q.  Please explain the numerous possibilities that

13   went through your mind at the time.

14        A.  It could have been a drunk driver.  Could have

15   medical issues.  Could have just assaulted somebody.

16   Don't know if he's got a girlfriend laying on the

17   floorboard on the passenger side, wife, or somebody

18   else.

19            Could have murdered somebody.  Don't know.  I

20   couldn't tell you.  Those are all the things that go

21   through my mind when a car fails to yield.  All of those

22   things come into mind.

23        Q.  After Mr. Anderson got out of his truck, did he

24   verbally threaten to harm anybody?

25        A.  No, he didn't.
```

                                                          44

1     MR. SMYTH:  Vague.

2     THE WITNESS:  Sorry.  No, he did not.

3  BY MR. ODIWE:

4     Q.  Did he get into a fighting stance?

5     A.  No, he did not.

6     Q.  Did he ball his fists?

7     MR. SMYTH:  Vague.  Lacks foundation.

8     THE WITNESS:  I don't recall.

9  BY MR. ODIWE:

10    Q.  Did he charge at any of the officers on the

11 scene?

12    A.  No.

13    Q.  Did you see a weapon in his hand?

14    A.  No.

15    Q.  Did you notice a weapon anywhere on his person?

16    MR. SMYTH:  Lacks foundation.  Vague.

17    THE WITNESS:  Just on the front waistband it

18 appeared that he did not have a weapon.

19 BY MR. ODIWE:

20    Q.  Can you expand on that?

21    A.  That's all I could see was the front of his

22 waistband.  He was facing us.  I don't know -- don't

23 know if he had anything in his pocket.

24    Q.  Did you see any weapon in his pocket?

25    A.  I can't see what's in his pocket.  I couldn't

45

DEPOSITION OF CORPORAL ROBERT HERNDON

1       A.  Because I know what's inside those boxes.

2       Q.  Is there any other reason based on the

3   circumstances up to that point why you were afraid that

4   Mr. Anderson was going to arm himself with a weapon?

5           MR. SMYTH:  Vague.

6           THE WITNESS:  So when somebody is not complying

7   to any of our commands and they duck -- quickly duck, it

8   was a short run to the box, and then he opens it, that

9   is not what normal people do on a traffic stop.

10          So in my opinion, I had to make sure that he

11  wasn't going to arm himself because I know what's in

12  there.  Crowbars, chains, because -- again, it's a

13  trailer that carries cars which I know you have to tie

14  them down with chains and you have to use a bar to

15  tighten those chains down, or he could have had a gun in

16  there for protection.

17  BY MR. ODIWE:

18      Q.  Why did you holster your service weapon when

19  you saw Mr. Anderson attempt to open the toolbox?

20      A.  No, I holstered -- I believe, I holstered my

21  weapon when he -- right before he ducked under.  I have

22  to look again.  Pretty sure it was right about the time

23  he ducked because I thought he was going to run.

24      Q.  Okay.

25      A.  Right about the time he went under, I holstered

                                                          49

DEPOSITION OF CORPORAL ROBERT HERNDON

1    my service weapon and retrieved my taser.  This was

2    right before he -- right before he went to the box.

3         Q.  Why did you believe that he was going to run?

4         A.  Just by him ducking.  Again, that's not what

5    normal people do -- duck around a gooseneck quickly.

6             MR. SMYTH:  Whenever it's good for you, can we

7    take a break whenever?  You can keep going for a little

8    bit.

9             MR. ODIWE:  We can take a break.

10            MR. SMYTH:  Now is fine?

11            MR. ODIWE:  Yeah, it's fine.

12                      (Recess was taken.)

13   BY MR. ODIWE:

14        Q.  So did it occur to you that Mr. Anderson was

15   reaching into his toolbox to get tools that he needed to

16   unload the vehicles that were on his commercial trailer?

17            MR. SMYTH:  Objection.  Calls for speculation.

18            THE WITNESS:  I have no idea what his thoughts

19   were.

20   BY MR. ODIWE:

21        Q.  I'm not talking about his thoughts.

22            When you saw Mr. Anderson reach into his

23   toolbox, did you believe that it was a possibility that

24   he was trying to get the tools needed to unload the

25   vehicles that were on his commercial trailer?

                                                        50

DEPOSITION OF CORPORAL ROBERT HERNDON

1         A.  Yes.

2             MR. SMYTH:  Incomplete hypothetical.  Go ahead.

3    BY MR. ODIWE:

4         Q.  Why is it important for a police officer to

5    avoid tasking somebody if they can?

6             MR. SMYTH:  Calls for expert opinion.

7    BY MR. ODIWE:

8         Q.  From your training.

9             MR. SMYTH:  Vague.

10            THE WITNESS:  Again, the variables are just --

11   it's just too many variables.

12   BY MR. ODIWE:

13        Q.  If a suspect is not posing an immediate threat

14   of harm, why would it be wrong for an officer to deploy

15   his taser against that subject?

16        A.  You're going in that situation?

17        Q.  It's a pretty basic situation.

18        A.  So, no.

19        Q.  "No" what?

20        A.  If he poses no threat?

21        Q.  Exactly.

22        A.  Just standing still doing nothing?

23        Q.  Based on your training, would it be proper to

24   deploy a taser on that individual?

25        A.  On a person that's doing nothing?

                                                        57

1        Q.   On a person that does not pose a threat of

2    harm.

3        A.   Absolutely.  Go ahead.

4            MR. SMYTH:  That part is vague.  Assumes facts.

5    Incomplete hypothetical.

6            THE WITNESS:  Of course not.

7    BY MR. ODIWE:

8        Q.   I want to move to commands more in general.

9    Okay?

10       A.   Okay.

11       Q.   When you give someone commands, those commands

12   are supposed to be clear and understanding; correct?

13           MR. SMYTH:  Vague.

14           THE WITNESS:  Yeah.  Okay.  Go ahead.  Yes.

15   BY MR. ODIWE:

16       Q.   That means that you leave no room for

17   interpretation?

18           MR. SMYTH:  Overbroad.  Lacks foundation.

19           THE WITNESS:  Yeah, I mean, you just give them

20   certain concise orders, simple orders.

21   BY MR. ODIWE:

22       Q.   And clear orders means that there's no room for

23   interpretation; correct?

24       A.   Yeah.

25           MR. SMYTH:  Calls for a legal conclusion.

58

DEPOSITION OF CORPORAL ROBERT HERNDON

```
 1          A.  Yes, I did.

 2          Q.  Is there anything you want to add to your

 3   police report?

 4          A.  No.

 5              MR. SMYTH:  Objection.  Vague.  Ambiguous.

 6   Lacks foundation.

 7              MR. ODIWE:  You can go ahead and answer.

 8              THE WITNESS:  I said no.

 9   BY MR. ODIWE:

10          Q.  Once Mr. Anderson was out of his vehicle, you

11   never heard another officer order him to get back inside

12   his vehicle; correct?

13              MR. SMYTH:  I would object as vague.

14              THE WITNESS:  I don't recall.

15   BY MR. ODIWE:

16          Q.  Once Mr. Anderson was out of the vehicle, you

17   drew your firearm; correct?

18          A.  Yes.

19          Q.  At that time, you had no information that

20   Mr. Anderson was armed and dangerous?

21          A.  No.

22              MR. SMYTH:  It's overbroad.

23   BY MR. ODIWE:

24          Q.  Does that mean "no" you did or "no" you did

25   not?
```

64

DEPOSITION OF CORPORAL ROBERT HERNDON

 1        A.  I did not or did what?

 2            MR. SMYTH:  Vague.

 3   BY MR. ODIWE:

 4        Q.  Did you have information that Mr. Anderson was

 5   armed and dangerous?

 6        A.  No.

 7        Q.  And at the time you drew your firearm, you had

 8   no information that Mr. Anderson was armed and

 9   dangerous; correct?

10            MR. SMYTH:  I'm going to object.  Overbroad.

11            THE WITNESS:  I believe I answered that

12   already.

13            MR. SMYTH:  Yeah, asked and answered.

14   BY MR. ODIWE:

15        Q.  You can go ahead and answer the question.

16        A.  No, I did not know.

17            MR. SMYTH:  I'm going to object as compound

18   belatedly to "armed and dangerous."

19   BY MR. ODIWE:

20        Q.  You ordered Mr. Anderson to put his arms in a

21   safe position; correct?

22            MR. SMYTH:  Vague as to "safe position."

23            THE WITNESS:  Correct.

24   BY MR. ODIWE:

25        Q.  You can go ahead and answer.

                                                          65

DEPOSITION OF CORPORAL ROBERT HERNDON

```
 1              MR. SMYTH:  Objection.  Lacks foundation.

 2              THE WITNESS:  Correct.

 3   BY MR. ODIWE:

 4       Q.  And it's not in your report; correct?

 5       A.  Correct.

 6       Q.  Mr. Anderson fell to the ground as a result of

 7   being tased the first time?

 8       A.  Yes.

 9              MR. SMYTH:  That's a question?

10              MR. ODIWE:  Correct?  That would be the

11   question.

12              THE WITNESS:  Yes.

13   BY MR. ODIWE:

14       Q.  Once the first cycle ended, Mr. Anderson tried

15   to get up; correct?

16       A.  Yes.

17       Q.  What part of his body hit the ground first?

18       A.  Don't know.  Don't recall.

19       Q.  During this first tasing, Mr. Anderson said

20   nothing to indicate that he was resisting arrest;

21   correct?

22              MR. SMYTH:  That's vague.  Overbroad.

23              THE WITNESS:  No.

24   BY MR. ODIWE:

25       Q.  "No" he did or "no" he did not?
```

                                                         71

DEPOSITION OF CORPORAL ROBERT HERNDON

1        A.  No, he did not.

2        Q.  Mr. Anderson did not curse; correct?

3            MR. SMYTH:  Vague as to time.  When?

4   BY MR. ODIWE:

5        Q.  Mr. Anderson did not curse while he was on the

6   ground after being tased the first time?

7        A.  I don't know.  I don't recall.

8        Q.  If he had, would that be something that you

9   would have written in your report?

10       A.  Not necessarily.

11       Q.  Why not?

12       A.  Because that wasn't the actions -- that wasn't

13   the action that caused us to deploy the taser the second

14   time.

15       Q.  So if Mr. Anderson had told you after being

16   tased the first time that he was refusing to comply,

17   isn't that something you would have written in your

18   report?

19           MR. SMYTH:  Incomplete hypothetical.

20           THE WITNESS:  Don't know.

21   BY MR. ODIWE:

22       Q.  What do you mean by "don't know"?

23       A.  I don't know if I would have wrote it.

24       Q.  Why don't you know?

25       A.  Because that's not what -- that's not the

                                                          72

DEPOSITION OF CORPORAL ROBERT HERNDON

1    "Provide other officers and individuals with a warning

2    that the taser device may be deployed."  All right.

3            Looks like the policy of the Vallejo Police

4    Department is that a verbal warning should be given to a

5    suspect before a taser is deployed and was this -- did

6    this happen -- did you give a warning to Jason Anderson

7    before you deployed your taser?

8            MR. SMYTH:  Objection.  Overbroad.  Asked and

9    answered.  Vague.

10   BY MR. ODIWE:

11       Q.  You can answer.

12       A.  I don't believe so.

13       Q.  Okay.  And I want to go to the second page of

14   the policy.  That's going to be the last sentence at the

15   top.  The last sentence of the second paragraph at the

16   top.  "The fact that a verbal or other warning was given

17   or the reason it was not given shall be documented by

18   the officer deploying the taser device in the related

19   report."

20           Can you just explain to me why you didn't give

21   a reason for not documenting your use of a taser on

22   Mr. Anderson in your police report?

23           MR. SMYTH:  Vague.

24           THE WITNESS:  Probably left it out.  I just

25   don't recall.  I know we made a bunch of commands so I

                                                              79

DEPOSITION OF CORPORAL ROBERT HERNDON

1    don't recall what the commands were.  He was not

2    complying to -- whether it was telling him to stop or

3    whatever, so...

4    BY MR. ODIWE:

5        Q.  Would you agree that it's against Vallejo

6    Police Department policy not to explain the reason why

7    you document the use of a taser or the commands that you

8    gave before deploying a taser?

9            MR. SMYTH:  I'm going to say vague.  Overbroad.

10   Calls for legal conclusion and expert opinion.

11           THE WITNESS:  I couldn't tell you why it didn't

12   other than it must have been a busy day.  I just

13   overlooked it.

14   BY MR. ODIWE:

15       Q.  Okay.

16       A.  I'm assuming because everything was happening

17   so fast that's why I probably didn't give the commands.

18       Q.  Okay.  I got you.  Moving on here.

19           Did you use your taser in probe or dart mode?

20       A.  I'm sorry.  What?

21       Q.  Did you use your taser in probe or dart mode?

22       A.  You're going to have to clarify.

23       Q.  All right.  So you told me earlier you believe

24   you had the X26 taser?

25       A.  Yeah.

                                                          80

1    Q.  It's my understanding --

2    A.  My bad.  It was in dart mode.  My bad.

3    Q.  How far were you standing from Anderson when

4    you deployed your taser the first time?

5    A.  From here to the plant.  So what's that?  About

6    six feet.

7    Q.  Six feet?

8    A.  Six feet to eight feet.

9    Q.  My understanding is when you use a taser once

10   in probe or dart mode, it's a five-second cycle

11   generally.  Is that your understanding?

12   A.  Yes.

13   Q.  Okay.  And can you tell me where the darts hit

14   Mr. Anderson when you deployed your taser?

15   A.  I don't know.

16   Q.  Okay.

17   A.  I don't know if -- it might be in my taser

18   report.  I don't know.  Mind if I look at my report?

19   Q.  Of course.

20   A.  It doesn't say.

21        MR. SMYTH:  I don't know -- do you want him to

22   look at any of the documents I have?  I brought our

23   whole production of documents.

24        MR. ODIWE:  Oh, perfect.  I was trying to get a

25   copy of Exhibit A which was his crime report.  I don't

81

1    effective."  Yes.

2         Q.  Exactly.  That's the first time you deployed

3    your taser; correct?

4         A.  Yes.

5         Q.  What did you mean by "The taser was initially

6    effective"?

7         A.  He was down on the ground.

8         Q.  Okay.  And after that point, you say that

9    Anderson tried to get up?

10        A.  Yes.

11        Q.  What threat did Anderson pose after he tried to

12   get up?

13        A.  He was just trying to get up.  He was just

14   trying to get up.  He was on his back, and he was trying

15   to get back up.

16        Q.  What threat of harm did Mr. Anderson pose to

17   you or any other officer on the scene at the time he

18   tried to get up?

19             MR. SMYTH:  Vague.

20             THE WITNESS:  Well --

21             MR. SMYTH:  Assumes facts.

22             THE WITNESS:  He could get up and attack us.

23   BY MR. ODIWE:

24        Q.  Did he verbally express that he wanted to

25   attack any of the officers?

83

DEPOSITION OF CORPORAL ROBERT HERNDON

1        A.   No.

2        Q.   Did he ball his fist?

3        A.   No.

4        Q.   Did he charge in your direction?

5        A.   No.

6        Q.   Did he charge in the direction of any other

7   officer?

8        A.   Nope.

9        Q.   Did you see a weapon in his hand?

10        A.   No.

11        Q.   Did you see him reach for a weapon?

12             MR. SMYTH:  Vague.

13             THE WITNESS:  Oh, sorry.

14   BY MR. ODIWE:

15        Q.   Did you say anything else to him at that point?

16        A.   Did I what?

17        Q.   Did you say anything else to Mr. Anderson at

18   that point where he attempted to get up after being

19   tased the first time?

20        A.   He was told several times.  I don't know how

21   many times, but several times to roll over so we could

22   put his hands behind his back.

23        Q.   Was that several times altogether, or after he

24   attempted to stand up after being tased the first time?

25        A.   That was after -- it was after the first time

84

DEPOSITION OF CORPORAL ROBERT HERNDON

```
 1    and after the second time.
 2         Q.   What happened after you deployed the second
 3    cycle?
 4         A.   After the second one, same thing.  He was
 5    trying to get up.
 6         Q.   What threat did he pose at that time when he
 7    tried to get up a second time?
 8              MR. SMYTH:  Vague.  Calls for legal conclusion.
 9              THE WITNESS:  I mean, he can get up and attack
10    us or run.
11    BY MR. ODIWE:
12         Q.   Did he verbally threaten to attack any of the
13    officers when he attempted to get up the second time?
14         A.   No.
15         Q.   Did you see a weapon in his hand?
16         A.   No.
17         Q.   Did he run to reach for a weapon?
18         A.   No.
19         Q.   Did he charge at any of the officers?
20         A.   No.
21         Q.   Did you give Mr. Anderson a command after he
22    stood up the second time?
23         A.   He didn't stand up.  He was trying to get up.
24         Q.   He was trying to stand up.  Did you give him a
25    command when he was trying to stand up after being tased
```

85

1    the first time?

2        A.  Again, he was told several times.  During the

3    second -- after the first taser deployment and after the

4    second -- it's not the deployment because -- activation.

5    I'm sorry, that's the word I'm looking for.

6            After the second activation, he was told

7    several times to roll over to his stomach so that we can

8    handcuff him.

9        Q.  What happened after Mr. Anderson was tased the

10   third time?

11       A.  At that time he complied.

12       Q.  What do you mean by "he complied"?

13       A.  He rolled onto his stomach and he was

14   handcuffed.

15       Q.  Did any officer on the scene command

16   Mr. Anderson to roll on his stomach?

17       A.  I can't recall.

18       Q.  Can you not recall the officer that made the

19   command, or if he was commanded at all to roll on his

20   stomach?

21       A.  No, I don't know who the officer was who called

22   it out.

23       Q.  But you do recall that he was commanded to roll

24   on his stomach?

25       A.  Because he did.

                                                        86

 1    identify each of these voices.  Okay?

 2         A.  You're going to have to stop it, then.

 3         Q.  Oh, I'll stop it several times.

 4              MR. SMYTH:  I think he's going to play it once

 5    full through and then we'll go back.

 6              THE WITNESS:  Okay.

 7    BY MR. ODIWE:

 8         Q.  Exactly.  I'm going to go back and we're going

 9    to go voice by voice and see if you can identify who is

10    talking on these videos.

11              We're going to start with the Male Voice 1, who

12    says "How do you work this stupid thing?"  Okay?

13         A.  That's me.  If you go past that, that's me.

14         Q.  We're going to get it in one second here.  It

15    should come up in about ten seconds here.

16                        (Audio was played.)

17    BY MR. ODIWE:

18         Q.  All right.  So you're the person that said,

19    "How do you work this stupid thing?"

20         A.  Yeah.

21         Q.  Can you tell me what you meant when you said,

22    "How do you work this stupid thing?"

23              THE WITNESS:  Can I answer it?

24              MR. SMYTH:  Yeah.

25              THE WITNESS:  The car camera.

                                                              91

DEPOSITION OF CORPORAL ROBERT HERNDON

```
1    BY MR. ODIWE:

2         Q.   Excuse me?

3         A.   The car camera.

4         Q.   Why were you trying to work the car camera?

5         A.   Because I was trying to see if the actual

6    incident took place on it -- on the car camera.  What do

7    you call it?  The hard drive.

8         Q.   Were you trying to watch the car camera, or

9    were you trying to turn the car camera off?

10        A.   No, I was trying to turn it on.

11        Q.   You were trying to turn it on.

12        A.   I was trying to figure out if you can play it

13   back or if we even recorded it.

14        Q.   Can you explain why you wanted to know why --

15   or if it was recorded?

16        A.   Just to see if it was recorded.

17        Q.   For what purpose?

18        A.   To see if I could work the stupid thing.

19        Q.   I mean, for what use?  What was the utility?

20   Why were you trying --

21        A.   Because I was learning how to use the camera.

22        Q.   Learning for what purpose?

23        A.   So I could learn how to use it.

24        Q.   For what use?

25             MR. SMYTH:  He's trying to ask you why did you
```

92

1    want to activate that camera.

2            THE WITNESS:  Just to see if the thing was

3    caught on -- to see if the incident was caught on

4    camera.

5    BY MR. ODIWE:

6        Q.   You wanted to see if the incident was caught on

7    camera?

8        A.   Yeah.

9        Q.   Why would it be important for the incident to

10   be caught on camera?

11           MR. SMYTH:  That's vague.

12           THE WITNESS:  So that we can put it in the

13   report.

14   BY MR. ODIWE:

15       Q.   Okay.  We're going to go on to the next voice

16   here.  That's going to be the voice that says, "What are

17   you doing?"

18           We're going to listen to it right now and see

19   if you can tell me who said that.  Okay?

20                   (Audio was played.)

21           THE WITNESS:  I want to believe it sounds like

22   Gordon.

23   BY MR. ODIWE:

24       Q.   Would that be Steve Gordon?

25       A.   Yes.

                                                        93

```
 1        Q.   Can you tell me where Mr. Gordon is currently
 2   employed?
 3        A.   He's retired.
 4        Q.   Retired.   Now, the next voice here it says "Now
 5   I'm -- I've got all of this."   We're going to figure out
 6   who this is.   Okay?
 7        A.   All right.
 8                        (Audio was played.)
 9             THE WITNESS:   That's me.   And the second voice,
10   "Shit.   Oh, I can't help you."   That would be Gordon.
11   BY MR. ODIWE:
12        Q.   What did you mean when you said, "Well, I'm --
13   I've got all of this"?
14        A.   The whole report.
15        Q.   The whole report?
16        A.   Or maybe it was -- probably him being tased on
17   video.
18        Q.   And you mentioned him being tased on video.   Is
19   that something that you have seen before?
20        A.   No.   I'm just trying to see if it was him being
21   tased on video -- wanted to see if it got recorded.
22   Have I seen it?   No, I haven't seen it.
23        Q.   Do you have an understanding if that video
24   exists?
25        A.   No.
```

94

DEPOSITION OF CORPORAL ROBERT HERNDON

1        Q.  Let's go down to the next voice.  "Shit.  Oh, I
2    can't help you."

3        A.  That's Gordon.

4        Q.  That's Gordon.  Let's just go back and confirm
5    it.

6                        (Audio was played.)

7    BY MR. ODIWE:

8        Q.  That's going to be Gordon; right?

9        A.  "Him being tased on video," that's me.

10       Q.  Okay.  Let's go...

11                       (Audio was played.)

12           THE WITNESS:  That's me.

13   BY MR. ODIWE:

14       Q.  I'm trying to figure out what you mean here
15   when you said, "This is a fucking traffic problem, and I
16   got involved in it.  That's what I get for leaving my
17   post."

18           You sounded frustrated when you said that.  Can
19   you tell me what was going on there?

20       A.  No, I wasn't frustrated.  That's our stupid
21   banter that we do with each other.

22       Q.  Can you tell me why you left your post?

23           MR. SMYTH:  Asked and answered.

24           THE WITNESS:  I answered that earlier.

25   //

                                                          95

DEPOSITION OF CORPORAL ROBERT HERNDON

1    BY MR. ODIWE:

2         Q.  If you could just go ahead and answer.

3         A.  It's because he asked for help.

4         Q.  All right.  "That's what I get for leaving my

5    post and getting involved with it."

6             All right.  So let's go down and see what the

7    next voice is.  Okay?  That's going to be "Now you've

8    got to help me do some paperwork."

9                         (Audio was played.)

10            THE WITNESS:  That's Gordon.

11   BY MR. ODIWE:

12        Q.  That's Gordon.  All right.

13        A.  And then the second voice "Yeah, you got to do

14   this use of force," that's me.

15                        (Audio was played.)

16            THE WITNESS:  "That's bullshit, Bobby."  That's

17   Steve Gordon.

18            MR. ODIWE:  That's Gordon that said that.  Then

19   the next voice here it says "Well, he was running.

20   Well, it looked like he was running.  I looked -- it

21   looked like he was going to grab a..."

22                        (Audio was played.)

23   BY MR. ODIWE:

24        Q.  Is that you?

25        A.  That's me.

96

1      Q.  All right.  So what did you mean when you said,

2   "Well, it looked like he was running"?

3      A.  Because that's when he darted into that -- when

4   he darted from right where the tire hump -- this right

5   here, the fender, the left rear fender of his vehicle.

6          That's when he darted into the thing so I

7   assumed -- I thought he was going to run, but then he

8   stopped at the toolbox.

9      Q.  Let's go down to the next voice here.  "Get

10  your story straight."

11                    (Audio was played.)

12          THE WITNESS:  "Get your story straight" --

13  that's -- are you back down there?

14  BY MR. ODIWE:

15      Q.  Let me go back.

16      A.  I'm lost.

17      Q.  Whose voice is "Get your story straight"?

18      A.  That's Gordon.

19      Q.  And the next voice here it says "It looked like

20  he was going to grab a tool out of the toolbox."

21      A.  That's me.

22                   (Telephonic Interruption.)

23  BY MR. ODIWE:

24      Q.  Okay.  So that's you.  Next voice here it's

25  going to say "It looked like he -- no, he was."

97