# EXHIBIT 4

```
 1                 UNITED STATES DISTRICT COURT
 2       EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION
 3
 4   JASON ANDERSON,            )
                                )
 5           Plaintiff,         )
                                )
 6                              )
             vs.                )  Case No. 2:17-cv-00137-JAM-DB
 7                              )
                                )
 8   CITY OF VALLEJO, a         )
     municipal corporation;     )
 9   et al.                     )
                                )
10           Defendants.        )
                                )
11   _____)
12
13
14
15
16            DEPOSITION OF ROGER CLARK
17                 June 10, 2019
18                   9:56 a.m.
19              Vallejo, California
20
21
22
23
24   REPORTED BY:  CECILIA E. RODRIGUEZ
                   CSR No. 11479, RPR
25
```

```
 1   APPEARANCES:

 2        For Plaintiff:

 3            LAW OFFICES OF JOHN L. BURRIS
              LATEEF H. GRAY, ESQUIRE
 4            JAMES COOK, ESQUIRE
              Airport Corporate Centre
 5            7677 Oakport Street
              Suite 1120
 6            Oakland, California 94621
              (510) 839-5200
 7            lateef.gray@johnburrislaw.com

 8        For Defendants:

 9            CITY OF VALLEJO
              TIMOTHY R. SMYTH, Deputy City Attorney
10            555 Santa Clara Street
              Third Floor
11            POST Office Box 3068
              Vallejo, California 94590
12            (707) 648-4545
              timothy.smyth@cityofvallejo.net
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  understand that also came from Mr. Anderson?
2      A.   Yes, clearly.
3      Q.   And in regard to your understanding of what --
4  how this factual account occurred, do you have an
5  understanding of how much of this was actually the
6  cycling of TASER?
7      A.   I have the report.  I can explain it to you.
8      Q.   And you're referring to the TASER printout?
9      A.   Yes.
10     Q.   Sure.  Yeah.  Tell me what you -- your
11 understanding of the TASER usage.
12     A.   Okay.  So we have a report showing Model X26,
13 Serial Number X00-066754.  And this is a partial printout
14 that's limited to four events.  And the event numbers are
15 43 to 46.  Let me add that the X26 TASER has a memory
16 device that records each trigger pull in terms of date,
17 time and duration, and does not override itself until
18 around 1500 separate events that are recorded.  It's --
19 an internal clock has to be synchronized in order to get
20 it to sync it with events as they're occurring.
21          So an event cycle number -- Event Number 43,
22 which according to this printout, occurs on June 9, 2015
23 at 12:33:41 hours for six seconds.  So we back up -- this
24 is the end time of the six seconds.  So this trigger was
25 pulled at 12:33:35.  That's when the trigger was pulled.

51

```
 1   Okay?
 2       Q.   Okay.
 3       A.   Then we have Event Number 44 which ends at
 4   12:33:47 and is cited as a three-second cycle --
 5       Q.   Okay.
 6       A.   -- which means that it -- the trigger was pulled
 7   at 12:33 -- if this is accurate -- 12:33:44 --
 8       Q.   Okay.
 9       A.   -- which would be three seconds after the first
10   the first one ends.
11            Now, the significance of the three seconds is
12   that this weapon was manually turned off because it would
13   have gone for five.  The significance of the six seconds
14   is that he kept his finger on the trigger one second
15   beyond the five-second cycle, and then he lifted his
16   finger off the trigger, so he had his finger on the
17   trigger totally.  I'm assuming this is the right TASER.
18   Then the last sequence -- am I talking too much?
19       Q.   No.
20       A.   Okay.  The last sequence, which is Event Number
21   45 --
22       Q.   It's perfect.
23       A.   -- which ends -- and it appears to be very, very
24   close, but it ends at 12:33:49 and goes for two seconds.
25   And that's curious because that's like double push of the
```

1  trigger, something's going on here, but it goes for two
2  seconds, which means it started at 47, the end time of
3  the Event Number 44.
4       Q.   So your understanding --
5       A.   Yet you have --
6       Q.   Go ahead.
7       A.   You have in the record three full cycles
8  indicated.  And this is a readout of this particular
9  weapon.
10      Q.   So you're saying in the -- where does it say
11 there's full cycles from?
12      A.   Yeah.  It's not in this report.
13      Q.   Well, I mean, in whichever -- wherever in the
14 materials.
15      A.   Oh, it's in Herndon's.  And it's -- let me find
16 his report.  I think I got it here.
17           There you go.  Quote, at this time I deployed my
18 department issue TASER, and the TASER was initially
19 effective, meaning it worked.  Once the first cycle
20 ended, Anderson tried to get up.  He was ordered to stop
21 and comply with our commands to stop resisting and place
22 his hands behind his back.
23           Incidentally, this happened to be in the three
24 seconds.  He'd have to recover, have to hear it, blah,
25 blah, blah -- a lot of problems there.  But it's three

```
 1  calculus for the force as taught.  They used to have
 2  what's called sort of a linear listing of force where it
 3  falls in a sequence.  But the training now is that you
 4  address the behavior as it's presented to you.  And
 5  there's some typical expectations when you're facing that
 6  event.  So it goes cooperative, resistive, assaultive,
 7  combative and life threatening.
 8  BY MR. SMYTH:
 9      Q.   Okay.  In this spectrum if you were taking the
10  plaintiff's account as true, you'd probably put him
11  where, under cooperative or --
12      A.   The plaintiff's?
13      Q.   Yeah.
14      A.   He was cooperative.
15      Q.   If you were to be taking the defense position
16  with regard to Mr. Anderson, where would you put him on
17  this spectrum?
18      A.   Nothing further than resistive and would be a
19  verbally resistive, not physically resistive.
20      Q.   Okay.  So he's kind of a verbal -- verbal
21  resistive is what you said?
22      A.   Right.
23      Q.   And is that on here under one of these
24  particular five categories when you're looking at --
25      A.   Yeah.  So it's the resistive.  Being resistive
```

1  just heard, it couldn't have been three minutes or so of,
2  you know, physical beating at that?
3       A.   No.
4            MR. GRAY:  Objection.  Calls for speculation.
5            THE WITNESS:  It would only seem that way to the
6  recipient.  Other than that, I would agree.
7  BY MR. SMYTH:
8       Q.   Okay.  And with regard to -- well, is there
9  anything else you took from that just hearing it just now
10 about the incident that either supports or contradicts
11 anything about what you understood prior to coming here
12 today?
13      A.   Well, you can hear his voice in the background.
14 You have to listen to it more.  I would have many to
15 listen to it a number of times to see what -- if you can
16 tell what's being said.  But I think what's -- my initial
17 take appears to me is the time he -- it's logical the
18 time they announce they pulled into the dental, gave that
19 location, that's the place of stopping, where he's pulled
20 over, stopped.  He has to get out.  He has to be --
21 present a threat sufficient for this tasing to occur.
22 It's far too quick.
23      Q.   Okay. Okay.  One last question.  Does this
24 audio change anything with respect to your -- any sort of
25 belief that Officer Coelho or Melville was involved in